```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF GEORGIA
                      ATHENS DIVISION

CAREY A. FORTSON,                 *

      Plaintiff,                  *

vs.                               *
                                       CASE NO. 3:13-CV-51 (CDL)
COLUMBIA FARMS FEED MILL,         *
ROBERT C. JOHNSON, BARRY
CHRONIC, MICHELLE CARLSON, and    *
MELVIN DUTTON,
                                  *
      Defendants.
                                  *
```

O R D E R

This case represents another example of a workplace that has not yet been cleansed of racist attitudes. Defendants' motion for summary judgment poses the difficult and recurring question of when these attitudes sufficiently alter the terms and conditions of a person's employment such that the aggrieved employee has a cause of action under the federal civil rights laws. The Courts have wrestled with this issue and have struggled to draw the line between obnoxious offensive utterances, which are generally not actionable and must be endured, and severe hostile race-based harassment that interferes with an employee's ability to do his job, which can be remedied pursuant to 42 U.S.C. § 1981 ("§ 1981") and Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").

Courts attempt this "line drawing" on a case-by-case basis with fact-intensive analysis.  Deciding where that line should be drawn as a matter of law in the context of summary judgment, as the Court must do here, presents a special challenge because the Court must determine what evidence is enough for a reasonable jury to be able to conclude that the employee was subjected to a racially hostile work environment.  That analysis necessarily requires the Court to "weigh" the evidence to some degree, an exercise that is typically better performed by a jury, but in the context of summary judgment, must be preliminarily done by the Court to determine whether there is *enough* for the jury to even consider.  As explained in more detail below, the Court finds that the conduct complained of by Plaintiff in this action falls on the "obnoxious offensive utterance" side of the line and not the "severe hostile race-based harassment" side.  Accordingly, Defendants' Motion for Summary Judgment (ECF No. 39) is granted, and Plaintiff's Motion for Summary Judgment (ECF No. 44) is denied.[1]

---

[1] In his Complaint, Plaintiff alleged claims for race, gender, and age based discrimination pursuant to Title VII, § 1981, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). He also alleged Georgia state law claims for negligent supervision/retention and intentional infliction of emotional distress.  The Court previously dismissed Fortson's Title VII, ADEA, and gender discrimination claims, as well as his claims against Robert

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

In the light most favorable to Plaintiff, the evidence reveals the following.

Plaintiff Carey A. Fortson ("Fortson"), a black male who is proceeding *pro se*, began working as a feed loader for Defendant Columbia Farms of Georgia ("Columbia Farms") in January 2010. He was initially assigned to the 3:00 p.m. to 11:00 p.m. shift, but was soon switched to the 5:00 p.m. to 4:00 a.m. shift. On June 21, 2012, a coworker photographed Fortson sleeping in the

---

Johnson. The claims that remain, which are subject to Defendants' summary judgment motion, are Plaintiff's § 1981 racially hostile work environment claim and state law claims against his employer and supervisors.

3

secretary's office of the feed mill during a break on his shift. According to the employee handbook Fortson received when hired, sleeping on the job is prohibited and punishable by immediate termination. Columbia Farms suspended Fortson for three days pending review of the incident, and then terminated him on June 27, 2012 in accordance with company policy. Fortson does not dispute that he was sleeping during his shift; nor does he seriously contest that this violation of company policy was the reason for his termination. Instead, now that he has been terminated, he complains that he was subjected to a racially hostile work environment during his employment.

Fortson points to evidence supporting twelve instances of coworkers yelling at him, cursing at him, and calling him racial epithets during his two-and-a-half years of employment.[2] These include coworkers telling him "Hey, black ass, hurry," and "I can have your black ass put away, buddy. Give me my damn paperwork." Fortson Dep. Ex. 7, Harassment Allegation List, ECF No. 43-7. The name-calling was apparently done as part of his coworkers' expression of dissatisfaction with Fortson's job performance. Nine instances involve a racial epithet. Andrews stated that he heard coworkers use racial epithets towards Fortson approximately fifty times, but that hearsay testimony is

---

[2] Fortson alleged nineteen such instances in his Third Amended Complaint, but he only pointed to evidence of twelve.

4

inconsistent with Fortson's evidence that included only nine such incidents. Dutton Dep. Ex. P-1, Andrews Statement, ECF No. 49-1 at 1; *see also Adams v. Austal, U.S.A., L.L.C.*, No. 12-11507, 2014 WL 2726171, at *1, *1 (11th Cir. June 17, 2014) (holding that "an employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile"). Fortson's wife claims that Fortson complained to her daily about coworkers harassing him and that his resulting emotional distress strained their marriage. Dutton Dep. Ex. P-2, Rucker Statement, ECF No. 49-1 at 2.

Fortson complained about the harassment to his supervisor, Defendant Melvin Dutton. Dutton did not act to stop the harassment. Fortson claims that Defendants Michelle Carlson, who works in Columbia Farms's Human Resources Department, and Barry Cronic, Columbia Farms's Chief Executive Officer, also should have known about the harassment and did nothing to stop it. Fortson met each of them only once, and did not complain to them about the harassment. He does not know if either of them knew that Dutton received his complaints, but he sued them because they have managerial responsibility. Fortson Dep. 103:23-104:5, 105:18-24.

DISCUSSION

**I.   § 1981 Racially Hostile Work Environment Claim**

Fortson alleges a § 1981 racially hostile work environment claim against Columbia Farms and its manager, Dutton.[3]  A workplace is considered racially hostile if it "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotation marks omitted).  To establish a racially hostile work environment claim, Fortson must show that: (1) "he belongs to a protected group;" (2) "he has been subject to unwelcome harassment;" (3) "the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) "the employer is responsible for such environment under either a theory of vicarious or direct liability."  *Id*.

---

[3] A supervisor who contributes to the hostile environment or does nothing to correct it may be liable under § 1981 in addition to the employee's actual employer.  *See Bryant v. Jones*, 575 F.3d 1281, 1296, 1299-1300 (11th Cir. 2009) (setting forth the elements required to prove a § 1981 hostile environment claim and explaining when supervisory liability occurs in the context of a § 1981 claim brought against county officials through 42 U.S.C. § 1983).

6

Defendants seek summary judgment, arguing that no reasonable jury could find that the alleged harassment was objectively severe or pervasive enough to alter the terms and conditions of Fortson's employment. In evaluating Defendants' motion, the Court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). No one factor is dispositive; the Court is instructed to look at the "totality of the circumstances." *Id*.

The Eleventh Circuit's application of these factors in cases involving similar circumstances is instructive. One such recent case is *Adams.* In that racially hostile work environment case, the district court had granted summary judgment in favor of the employer on the claims of thirteen employees but denied summary judgment as to two other employees, which were tried by a jury to verdicts in favor of the employer. *Adams*, 2014 WL 2726171, at *1.* On appeal, the Eleventh Circuit painstakingly analyzed the facts relevant to each employee's claim to determine whether they sufficiently supported a claim for racially hostile work environment. The Eleventh Circuit affirmed summary judgment as to six of the plaintiffs but

7

vacated summary judgment as to the other seven. *Id*. Fortson's alleged racially hostile work environment is more closely analogous to the experience of the six employees who had summary judgment against them affirmed in *Adams* than the seven employees in *Adams* who convinced the Court of Appeals that they had presented sufficient evidence to avoid summary judgment. The Court will evaluate Fortson's claims using the same factors applied by the Court of Appeals in *Adams* and compare Fortson's claims to those of the *Adams* plaintiffs.

A.  Frequency of the Conduct

The *Adams* plaintiffs who prevailed on appeal were subjected to significantly more frequent harassment than Fortson alleges. They were exposed to harassing conduct "every morning," "every day," "regularly," or "all the time." *See Adams*, 2014 WL 2726171, at *8-*10 (explaining that plaintiff Tesha Hollis "frequently heard white employees" use racial slurs and "saw a Confederate flag every morning;" Nathaniel Reed heard racial slurs and saw coworkers and supervisors wear Confederate flags "every day;" Ron Law, Jerome Pettibone, Frederick Williams, Nelson Bumpers, and Larry Laffiette frequently saw racist graffiti in the restrooms and heard coworkers and supervisors use racial slurs). Conversely, Fortson alleges twelve instances of harassment spanning seven months of his two-and-a-half years

8

of employment, with nine involving racial epithets. Harassment Allegation List.

   B.   Severity of the Conduct

The racial harassment against the prevailing plaintiffs in *Adams* was also more severe. One female plaintiff, Hollis, alleged that "[h]er supervisor pretended to masturbate in front of her while telling her that a racist and perverse drawing of her appeared in the men's restroom, and she saw the drawing" herself. *Adams*, 2014 WL 2726171, at * 7. Another plaintiff, Reed, was called "boy" on "several" occasions by his white supervisor and saw "I hate niggers" written on a boat he helped build. *Id.* at * 8. Plaintiff Pettibone discovered a noose in the break room, saw a drawing of a hangman with the caption "niggers," and heard that his supervisor had referred to "cheap slave labor." *Id.* Plaintiff Law heard a supervisor ask someone to "send him some monkeys," and heard a coworker say that "where he is from, they hang . . . niggers." *Id.* at *9. Plaintiff Bumpers heard his supervisor call black people "blue gums" twice, and the comment was directed to him once. *Id.* And Plaintiff Williams's supervisor carved the slur "porch monkeys" into the ship they were working on, and when Williams reported racist graffiti in the restroom to his supervisor, he was told "it's always been like that and if he didn't like it he could quit." *Id.* at * 10.

While the Court certainly does not place its imprimatur on the conduct to which Fortson was subjected, the Court does find that it was not as severe as the conduct the *Adams* court found was sufficiently severe and pervasive. To the contrary, the Court finds that the harassment experienced by Fortson was more analogous to the conduct the losing plaintiffs in *Adams* alleged, which the Court of Appeals found did not support a hostile work environment claim. *Adams* plaintiff Robert Adams heard the slur "nigger," which is severe. But "he heard it only a few times over several years, and he did not offer evidence that a supervisor used the word." *Adams*, 2014 WL 2726171, at * 11. If that conduct is not actionable, it is hard to say coworkers calling Fortson "black ass," which is arguably less severe than "nigger," is actionable. Similarly, *Adams* plaintiff Carolyn Slay saw racist graffiti on boxes in the women's restroom, heard a supervisor request "monkeys" over the walky-talky, and saw a toolbox with the phrase "don't feed the monkeys" written on it. *Id.* at *12. Yet, the Court of Appeals did not find this conduct sufficiently severe or pervasive to be actionable. If that conduct is not actionable, it is difficult to perceive how a coworker calling Fortson "black ass" in the course of berating his job performance could be. Moreover, the *Adams* Court also found that conduct directed to plaintiff Franklin Thomas, which included "'[seeing] a lot' of racist graffiti" and "white

10

employees' paraphernalia with the Confederate flag," was offensive but not sufficiently severe to be actionable. *Id.* at *13. If being exposed to racist graffiti and the Confederate flag regularly is not sufficiently severe to establish a racially hostile work environment, it would be arbitrary to conclude that being called a "black ass" on occasion would be.

### C. Physically Threatening or Humiliating Conduct

It is also noteworthy that the conduct Fortson complains about was not nearly as physically threatening or humiliating as the conduct alleged by the successful *Adams* plaintiffs. The *Adams* plaintiffs were regularly subjected to humiliating slurs like "monkey," "porch monkey," "nigger," "boy," and "blue gums." *Id.* at *7-*11. And they also had to endure threatening behavior that included a noose in the break room and graffiti such as "I hate niggers" and a hangman with "nigger" on it. *Id.* at *8-*11. Insensitivity to such hostility was compounded by the daily presence of Confederate flags on the apparel of both employees and supervisors. *Id.* As the Court of Appeals found, the totality of the circumstances alleged by the prevailing *Adams* plaintiffs demonstrated that they were subjected to a hateful, threatening, humiliating work environment based on their race almost daily. It is also important that supervisors participated in the harassing conduct in *Adams*.

In another case, the Eleventh Circuit found the physically threatening and humiliating nature of the harassment to be the "centerpiece" of an employee's hostile environment claim. In *Jones v. UPS Ground Freight*, the plaintiff premised his hostile work environment claim on the "repeated placing of banana peels on his truck . . . ; working around employees wearing confederate shirts on several occasions; racial comments made by [a coworker] to [Mr. Jones] directly; workers in the yard making racial statements in [his] presence; [and] being threatened by Caucasian employees after complaining about the racially hostile environment." 683 F.3d 1283, 1292-93 (11th Cir. 2012). The Eleventh Circuit found that Jones had pointed to sufficient evidence to create a jury question on whether he was subjected to a hostile work environment because of the "escalation of incidents, with a possibly threatening confrontation as its centerpiece." *Id.* at 1304. Fortson experienced no similar threatening confrontation, and the alleged harassment never escalated. It was spread out over seven months and ended five months before Fortson's employment was terminated.

Fortson failed to point to evidence that would support a finding that he was subjected to sufficiently threatening and humiliating harassment to support a hostile work environment claim. Although the Court certainly does not condone the language allegedly used here, the Court must evaluate the extent

12

to which such language was used and the manner in which it was used. Coworkers yelled at Fortson using phrases such as "dumb black ass." But these offensive utterances were not as directly threatening or humiliating as expressions found actionable in other cases. And the racial slurs were not so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *See E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068, 1070 (11th Cir. 1990) (explaining that for racial slurs to support a hostile work environment claim, the alleged conduct should meet that standard and not be sporadic).

Further, the context in which the alleged harassment occurred weighs against finding a hostile work environment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (explaining that it is necessary to consider "the social context in which particular behavior occurs and is experienced" when evaluating whether a work environment is hostile). While it may be indefensible to describe someone derogatorily based on the color of his skin, such conduct at Columbia Farms was not restricted to Fortson or black employees. The record includes undisputed evidence that Dutton was repeatedly called "white ass" when he worked in Fortson's position. Dutton Decl. ¶¶ 3-4, 7, ECF No. 40-18. Fortson has painted a picture of an unsophisticated work environment where crude language was commonplace and good manners were absent. But being subjected

13

to crude, boorish behavior does not necessarily provide a disgruntled employee with a legal cause of action.

### D. Interference with Job Performance

Finally, Fortson pointed to no evidence that the conduct to which he was allegedly subjected unreasonably interfered with his job performance. He offers no explanation as to how the hostile environment related in any way to his sleeping on the job, which was the undisputed reason for his termination.

In summary, the Court finds that Fortson has failed to point to sufficient evidence from which a reasonable jury could conclude that he experienced race-based harassment that was severe or pervasive enough to alter the terms and conditions of his employment. Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1981 racially hostile work environment claim.

## II. Intentional Infliction of Emotional Distress Claim

Fortson asserts that the conduct underlying his hostile work environment claim also supports an intentional infliction of emotional distress claim under Georgia law. For many of the same reasons, his intentional infliction of emotional distress claim also fails. To establish a claim for intentional infliction of emotional distress, Fortson must prove that Defendants subjected him to intentional or reckless conduct that was extreme and outrageous and caused severe emotional distress.

14

*Bartholomew v. AGL Res., Inc.*, 361 F.3d 1333, 1339 (11th Cir. 2004). Fortson presents no evidence that he suffered severe emotional distress. He has presented evidence from his wife that their marriage suffered because of Fortson's emotional distress. Rucker Statement. But there is nothing in the record indicating the severity of the distress. Furthermore, the conduct that Fortson complains about, while rude and insensitive, was not sufficiently extreme and outrageous to give rise to a tort claim under Georgia law. "Liability for intentional infliction of emotional distress has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Lockhart v. Marine Mfg. Corp.*, 281 Ga. App. 145, 147, 635 S.E.2d 405, 407 (2006) (internal quotation marks omitted). Words alone do not typically support an intentional infliction of emotional distress claim. "Plaintiffs are expected to be hardened to a certain amount of rough language." *Id*. (internal quotation marks omitted).

*Lockhart* makes it clear that Fortson has no intentional infliction of emotional distress claim under Georgia law. In *Lockhart*, a black plaintiff alleged that a supervisor ordered him to retrieve an item or else he would "have the [Ku Klux]

15

Klan burn a cross in [his] yard;" a coworker told him to be careful with a motor because "you can't pay for that [motor] with food stamps;" his manager told him "I ain't your m____f___ nigger;" and a supervisor told him "Boy, you're buying a lot of stuff.  You must be selling drugs."  281 Ga. App. at 146, 635 S.E.2d at 406 (first and third alterations in original).  The *Lockhart* court found that the plaintiff failed to establish an intentional infliction of emotional distress claim because the comments were not part of "a systematic effort to belittle and abuse" the plaintiff, but were "reactions to particular work situations over a lengthy period of time."  *Id.* at 147-48, 635 S.E.2d at 407.  Although Fortson arguably was subjected to more numerous derogatory comments, those comments were less severe, and like in *Lockhart*, most of them were in reaction to particular work situations spread out over a lengthy period of time.  Fortson had to endure conduct that was uncivil and rude, not extreme and outrageous under Georgia law.  He has no intentional infliction of emotional distress claim under Georgia law.

**III. Negligent Supervision/Retention Claim**

Given the Court's disposition of Fortson's other claims, he has nothing to which his negligent supervision and retention claim can be tethered.  See *Metro. Atlanta Rapid Transit Auth. v. Mosley*, 280 Ga. App. 486, 489, 634 S.E.2d 466, 469 (2006) ("A

16

claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent that the underlying substantive claims survive the same."). Accordingly, Columbia Farms is entitled to summary judgment on this claim.

## CONCLUSION

The evidence Fortson relies on is not sufficient to create a genuine factual dispute as to whether he was subjected to a racially hostile work environment or the intentional infliction of emotional distress. Therefore, Defendants are entitled to summary judgment on those claims. And in the absence of any substantive claim to which his claim for negligent supervision/retention could be connected, that claim too must fail. Accordingly, Defendants' Motion for Summary Judgment (ECF No. 39) is granted, and Plaintiff's Motion for Summary Judgment (ECF No. 44) is denied.

IT IS SO ORDERED, this 30th day of July, 2014.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE